AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**3/7/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____MMC_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**3/07/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____MR_____ DEPUTY

United States of America

v.

Jaime Arturo Carrillo,

Defendant(s)

Case No.   2:25-MJ-01274-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 13, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1040 | Fraud in Connection with Major Disaster or Emergency Benefits |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Luis Pineda, HSI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    March 7, 2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Elizabeth Douglas, x5728

## AFFIDAVIT

I, Luis A. Pineda, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Task Force Officer ("TFO") for the El Camino Real Financial Crimes Task Force with Homeland Security Investigations, a department within the Department of Homeland Security ("DHS"), and have been so employed since July 2024.

## II. BACKGROUND OF TFO PINEDA

2.    I am a Detective for the Hermosa Beach Police Department ("HBPD") and have been a Peace Officer for approximately three and a half years.  I have been employed by the City of Hermosa Beach for approximately nine years.  I was previously assigned as a Patrol Officer from 2021 through 2024. Since June 2024, I have been assigned to the HBPD Detective Bureau investigating financial crimes, property crimes, and crimes against persons.

3.    During the course of my career, I have investigated crimes involving narcotics, auto theft, weapons, property crimes, crimes against persons, as well as forgery, fraud, and identity theft.  I have assisted with search warrants for these crimes.  These investigations and search warrants have led to the arrest and convictions of multiple suspects, as well as the recovery of illegal narcotics, weapons, stolen property, evidence related to identity theft, counterfeiting, fraud, and other evidence consistent with criminal behavior.

1

4.   I have worked in an undercover capacity resulting in the arrest of suspects for violations of specific California penal codes, California health and safety codes, and/or California business and professions codes.  I have conducted interviews with numerous individuals who have been arrested and/or convicted of the above related crimes.  I have also conducted numerous hours of surveillance, which included following, observing, and studying the movements and behaviors of subjects involved in criminal activity.

5.   I graduated from the Golden West College Police Academy.  I have attended police department sponsored in-service training, attended multiple 30-hour Gang Conferences, a 40-hour Academy Instructor Certification Course, an 8-hour Sexual Assault training for First Responders, as well as received training instruction from senior officers and detectives on the elements of criminal investigations.  I have also received training on the writing and execution of search warrants.

### III. <u>PURPOSE OF AFFIDAVIT</u>

6.   This affidavit is made in support of a criminal complaint and arrest warrant against Jaime Arturo CARRILLO (the "TARGET") for a violation of 18 U.S.C. § 1040 (Fraud in Connection with Major Disaster or Emergency Benefits).

7.   This affidavit is also made in support of an application for a warrant to search the person of the TARGET, as described more fully in Attachment A.

8.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18

2

U.S.C. §§ 287 (False Claims), 1040 (Fraud in Connection with Major Disaster or Emergency Benefits), and 1343 (Wire Fraud) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

9. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts and weights are approximate, and all dates and times are on or about those indicated.

## IV. SUMMARY OF PROBABLE CAUSE

10. As part of my investigation into fraudulent claims for emergency benefits related to recent wildfires in the Los Angeles area, I obtained evidence that the TARGET obtained approval for emergency benefits covering two hotel stays to which he was not entitled. Specifically, the TARGET submitted a fraudulent application to the Federal Emergency Management Agency ("FEMA") alleging damage to a residence in South Los Angeles that did not sustain any damage relating to the wildfires and was outside the areas affected by the wildfires.

### V.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    The California Wildfires**

11.  As was reported in numerous international, national, and local media reports, in early January 2025, a series of destructive wildfires (the "California Wildfires") spread throughout the Los Angeles metropolitan area in California.  I understand these fires cumulatively burned nearly 60,000 acres of land, killed 29 people, forced more than 200,000 people to evacuate, and destroyed more than 16,000 structures.  According to the California Department of Forestry and Fire Protection (commonly known as Cal Fire), the largest of these fires were the Eaton and Palisades wildfires, which are second and third most destructive wildfires in California history.[1]

12.  Based on my review of a "4856-DR-CA-Initial Notice" provided by FEMA, I know that on January 8, 2025, President Biden approved a Major Disaster Declaration for California in response to the California Wildfires under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 <u>et seq</u>.

13.  From my involvement in this investigation, I know FEMA is an agency within the DHS.  FEMA's primary purpose is to coordinate the response to a disaster that has occurred in the United States and that overwhelms the resources of local and state authorities.  In response to the California Wildfires, FEMA made available a program to provide financial assistance to

---

[1] https://www.fire.ca.gov/our-impact/statistics (last visited March 5, 2025).

affected individuals and families ("victims").  Victims could apply for assistance online, with the FEMA mobile app, or by calling the FEMA Helpline.  Victims, including renters who lost their rental residences, could qualify for a one-time $770 FEMA relief payment, $43,600 for other needs assistance (personal property, transportation, medical, etc.), and housing assistance for up to 18 months at varying rates (1BR $2,081, 2BR $2,625, 3BR $3,335, 4BR $3,698).  Victims were also potentially eligible for additional relief up to $43,600 for home repair.  Additionally, victims were eligible for "Transitional Sheltering Assistance" which allowed those who were displaced to receive short-term, emergency sheltering options at participating hotels.

> **B.    The TARGET's Fraudulent Submission of Claims for FEMA Benefits Related to the California Wildfires**
>
>> 1.    The TARGET's Application for FEMA Assistance for a Property in South Los Angeles

14.    On February 19, 2025, I received a lead from the El Segundo Police Department ("ESPD") stating the TARGET potentially filed a fraudulent disaster assistance claim with FEMA.

15.    On February 25, 2025, I received an email from DHS-OIG Special Agent Nathanael Romero with an attachment containing a true and certified copy of the TARGET's FEMA disaster assistance application dated January 13, 2025.  I reviewed the attachment and observed the following:

    a.    On the "Application/Registration for Disaster Assistance" (Registration ID #63-8240980) the name of the

applicant was listed as Jaime A. Carrillo (the TARGET) with a
date of birth July 8, 1976, and Social Security Number ending in
9078.  Based on my review of the TARGET's criminal history
records, the date of birth and last four digits of the Social
Security Number in the application matches the TARGET's actual
date of birth and last four digits of his Social Security
Number.

    b.    The address of the damaged property was alleged
to be 413 W. 111th Street, Los Angeles, California 90061-1563
(the "111th Street Residence").  This address is in the Green
Meadows neighborhood in South Los Angeles which appears to be
more than twenty miles away from the Eaton and Palisades
wildfires according to Google Maps.

    c.    The TARGET stated that the 111th Street Residence
had been damaged on January 7, 2025, by "Earthquake; Fire/Lava
Flow/Ash; Flood; Power Surge/Lightning; Sewer Backup;
Tornado/Wind," as a result of the California Wildfires.  The
TARGET reported that the 111th Street Residence was the TARGET's
primary residence, and he was a renter.  Additionally, the
TARGET indicated "yes" to the question "Utilities out?".

    d.    In the application, CARRILLO provided a phone
number ending in -2746 (the "-2746 Number") as his current phone
number.

    2.    The 111th Street Residence Was Outside the Zone
          Affected by the California Wildfires

16.  Based on conversations with ESPD law enforcement
personnel, I know that on February 9, 2025, ESPD arrested the

6

TARGET for suspicion of being involved in the theft of a firearm belonging to an off-duty California Peace Officer.  ESPD interviewed the TARGET on February 10, 2025.

17.  On February 20, 2025, I received the body-worn camera footage for the TARGET's February 10 custodial interview from ESPD.  I learned the following from my review of the footage:

a.  I observed the TARGET sitting in a jail cell at the Hawthorne Police Jail.  The TARGET was read his Miranda Rights and indicated he understood his rights as read to him. The TARGET confirmed his identity to the ESPD Detectives.

b.  The TARGET then told ESPD Detectives he had lived at the 111th Street Residence but he had recently moved out after his mother passed away and the family sold the 111th Street Residence.  Since moving out, the TARGET had been "bouncing around" places and other persons who were not his relatives were now living at the 111th Street Residence.

c.  TARGET further stated he applied to FEMA because he was involved in "the fires."  He reported that FEMA had originally granted him disaster assistance.  However, FEMA later reevaluated TARGET's application and determined TARGET was not eligible for any disaster assistance because his "area code" did not qualify.  Therefore, FEMA stopped any further benefits for TARGET.

18.  I obtained true and certified copies of the real estate deed for the 111th Street Residence from the Los Angeles County Registrar – Recorder/County Clerk.  According to those records, the 111th Street Residence is a duplex described as a

multi-family home and listed under 411 W. 111th St, Los Angeles,
California 90061.  On or about May 30, 2024, the deed to the
residence was transferred to two new owners, S.A. and Y.L.  The
TARGET was not listed on that current deed, which was dated May
30, 2024.

19.  On January 13, 2025, FEMA mailed a letter, which I
reviewed, to the TARGET addressed to the 111th Street Residence.
The letter stated FEMA had received the TARGET's application for
FEMA disaster assistance (FEMA application #63-8240980) and
requested the TARGET to review the application for accuracy.
This application number was also noted on the TARGET's
reservation records at the HAWTHORNE HOTEL, as discussed further
below.

20.  On January 16, 2025, FEMA mailed a letter addressed to
the TARGET, which I reviewed, that stated FEMA had reviewed the
TARGET's application for FEMA disaster assistance, and
determined the application could not be approved for Housing
Assistance because the California Wildfires did not make the
111th Street Residence unsafe to live in.

21.  On FEMA's event log related to the TARGET's
application for benefits, which I reviewed, there is a note
stating the TARGET was not eligible for FEMA benefits due to the
111th Street Residence being outside of the fire perimeter and
evacuation zone.

22.  On February 26, 2025, I conducted a site inspection at
the 111th Street Residence and saw the residence was a multi-

story duplex and did not appear to have any obvious structural damage.

23. On March 5, 2025, I conducted a secondary site inspection at the 111th Street Residence. I spoke with the current tenant (the "TENANT"), who stated that s/he moved into the 111th Street Residence in January 2025. The TENANT reported that the TARGET had been living in the detached garage of the 111th Street Residence, but the TARGET moved out sometime in January 2025. The TENANT did not recall the exact date the TARGET moved out. The TENANT also stated the 111th Street Residence did not sustain any damage due to the California Wildfires or the high winds affecting the region during that time. Additionally, the TENANT did not experience any disruption to his/her utilities.

24. I informed the TENANT I was following up on the application the TARGET submitted to FEMA and needed to verify information on the application. The TENANT stated the TARGET "lied" on the FEMA application because the 111th Street Residence was not affected by the California Wildfires.

25. On March 5, 2025, I spoke with one of the current property owners, S.A., of the 111th Street Residence. S.A. informed me that the TARGET used to live at the 111th Street Residence, but after the TARGET's mother passed away the 111th Street Residence was sold. S.A. purchased the 111th Street Residence in the summer of 2024, but the TARGET refused to vacate and squatted in the 111th Street Residence for approximately six months after the sale. S.A. subsequently

evicted the TARGET via the Los Angeles Superior Courts, and the TARGET was issued a court order to vacate the 111th Street Residence by December 31, 2024.  The TARGET ultimately vacated the 111th Street Residence sometime on or about January 9, 2025. The TENANT at 111th Street Residence moved in on or about January 1, 2025.

26.  S.A. informed me the 111th Street Residence did not sustain any damage as a result of the California Wildfires or as a result of the high winds.  Additionally, to S.A.'s knowledge, there were no disruption of utility services to the 111th Street Residence.  S.A. also noted the tenants at 411 W. 111th Street (the unit below the 111th Street Residence) were not related to the TARGET and did not experience any hardship as a result of the California Wildfires

27.  S.A. was aware of the TARGET's attempt to apply for FEMA benefits.  S.A. informed me that the TARGET had asked the S.A. to "sign off" on the claim to FEMA, but S.A. refused to assist the TARGET with the claim because the 111th Street Residence was not damaged by the California Wildfires.

**C.    The TARGET Impermissibly Used FEMA Benefits to Stay at Two Hotels**

28.  As explained in detail below, the TARGET impermissibly used FEMA benefits to stay in two separate hotels.  The invoices for these hotel stays were billed to FEMA.

1.    The TARGET's Hotel Stay in El Segundo Paid for with FEMA Benefits

29.  I reviewed the ESPD crime report from the TARGET's February 9 arrest and learned that the TARGET had recently

stayed at a hotel (the "EL SEGUNDO HOTEL") in El Segundo, California.  I then conducted follow-up at the EL SEGUNDO HOTEL and was provided with the TARGET's hotel reservation invoice by the EL SEGUNDO HOTEL's Assistant General Manager.  The invoice stated that the TARGET stayed in room 111 from January 27, 2025, to January 30, 2025.  During that time, the TARGET spent approximately $107.87 in food/incidentals and the cost of the room was approximately $467.85.  According to the EL SEGUNDO HOTEL Assistant General Manager, when the TARGET checked in at the EL SEGUNDO HOTEL, the TARGET advised the hotel staff he was staying there using assistance from FEMA.

30.  The EL SEGUNDO HOTEL Assistant General Manager explained the process the EL SEGUNDO HOTEL used to confirm the validity of individuals claiming to use FEMA funds to pay for their hotel stay.  According to the EL SEGUNDO HOTEL Assistant General Manager, the EL SEGUNDO HOTEL must go to a disaster assistance website administered by FEMA, and enter the individual's personal information, such as name, date of birth, Social Security number, and FEMA registration identification number.  If benefits are approved, then the person will be allowed to stay at the EL SEGUNDO HOTEL at no cost to them.  The EL SEGUNDO HOTEL will then bill FEMA for the entire cost of the stay.

31.  According to the Assistant General Manager, the EL SEGUNDO HOTEL logged into the FEMA website and confirmed that the TARGET had applied to stay at the EL SEGUNDO HOTEL using FEMA funds.  I further reviewed the invoices provided to me, and

11

noted the invoices had the TARGET's name as the guest, with the reservation booked under "Emergency Lodging Assistance" and "FEMA/CLC." FEMA/CLC is the same website the EL SEGUNDO HOTEL Assistant General Manager advised me the EL SEGUNDO HOTEL used to check the eligibility of the TARGET.

32. I conducted a records check on the Emergency Lodging Assistance and the Corporate Lodging Consultants ("CLC") program and discovered that FEMA created the ELA program to provide temporary shelter as a result of a federal disaster declaration. As administrator for this FEMA-funded preparedness initiative, CLC provides rules-based payments for all qualified applicants at participating lodging providers. Only qualified individuals are eligible for lodging assistance under the terms of the ELA program. Lodging providers process all FEMA-qualified individuals seeking shelter through the ELA website. Each qualified participant is assigned an authorized start and end date. Qualified participants are only eligible for lodging assistance during their assigned authorization period.

33. On February 20, 2025, I reviewed surveillance footage from the EL SEGUNDO HOTEL. According to the surveillance footage, on January 27, 2025, at approximately 4:14 a.m., a male resembling the TARGET, based on the TARGET's California driver's license photograph and footage from the ESPD body-worn camera used during the TARGET's recorded interview on February 10, entered the EL SEGUNDO HOTEL lobby and walked to the front desk. At approximately 4:32 a.m. on January 27, the TARGET completed the check-in process, walked away from the front desk, and

exited the hotel lobby.  I reviewed documents from the EL
SEGUNDO HOTEL which confirmed the timeline of defendant's check-in.

          2.    The TARGET's Hotel Stay in Hawthorne Paid for
              with FEMA Benefits

       34.  On February 17, 2025, I conducted follow-up at a
separate hotel in Hawthorne, California (the "HAWTHORNE HOTEL")
regarding the TARGET's stay at that hotel.

       35.  I spoke with the HAWTHORNE HOTEL's Assistant General
Manager, who provided me with the TARGET's reservation
information (Folio #93983).  I reviewed the document and saw
that TARGET checked into the HAWTHORNE HOTEL on January 16,
2025, at approximately 9:27 p.m. and checked out on January 26,
2025.  The total cost for the room, including taxes and fees,
was approximately $1,705.40.

       36.  The HAWTHORNE HOTEL's Assistant General Manager also
provided me with a copy of a form titled "Federal Emergency
Management Agency – Transitional Sheltering Assistance Terms and
Conditions."  This form listed the TARGET's name, date of birth,
the last four of TARGET's Social Security number -- which
matched the date of birth and Social Security Number on the FEMA
disaster assistance application described above -- and FEMA's
registration ID #638240980.  According to the HAWTHORNE HOTEL's
Assistant General Manager, the TARGET was required to sign this
form at the time of check-in (dated January 16, 2025) and at the
time of check-out (dated January 26, 2025).  The HAWTHORNE
HOTEL's Assistant General Manager also advised the hotel had a

similar process as was used by the EL SEGUNDO HOTEL to verify the eligibility of the TARGET.

37.  On February 25, 2025, I reviewed a copy of surveillance footage provided to me by the HAWTHORNE HOTEL's Assistant General Manager, which captured the TARGET checking out of HAWTHORNE HOTEL.  I recognized the TARGET in the surveillance footage from his California driver's license photograph and from reviewing footage from the ESPD body-worn camera that was used during the TARGET's interview on February 10.  The HAWTHORNE HOTEL did not have a copy of surveillance footage capturing the TARGET checking in at HAWTHORNE HOTEL.

38.  My review of the surveillance footage showed the following:

a.  On January 26, 2025, at approximately 3:32 p.m., the TARGET entered the HAWTHORNE HOTEL lobby and approached the front desk.  A short time later, the TARGET spoke with the on-duty hotel manager.  At approximately 3:40 p.m., the TARGET walked away from the front desk.

b.  On January 26, 2025, at approximately 4:40 p.m., the TARGET was captured returning to the HAWTHORNE HOTEL lobby and grabbing a luggage cart.

c.  The same day at approximately 4:45 p.m., the TARGET returned to the HAWTHORNE HOTEL lobby with the luggage cart filled with luggage.  The TARGET then walked to the front desk and began the check-out process.  The TARGET checked out of the hotel at approximately 4:53 p.m.

d.   The TARGET wore the same exact clothing when he checked out of HAWTHORNE HOTEL and when he checked in to EL SEGUNDO HOTEL.

39.   On February 25, 2025, the HAWTHORNE HOTEL Assistant General Manager provided me with a screenshot of TARGET's hotel information from their computer system.  I reviewed the screenshot and saw the hotel had the 111th Street Residence and the -2746 Number listed for the TARGET.

**D.   The TARGET's Use of a Digital Device**

40.   Based on my review of FEMA's records relating to the TARGET's FEMA disaster assistance application dated January 13, 2025, I am aware of the following:

a.   FEMA's records indicate that the TARGET submitted his application for benefits via the internet on January 13, 2025.  The records also indicate that the TARGET's FEMA account was accessed via the internet on approximately 19 occasions between January 16, 2025, to January 31, 2025.

b.   On FEMA's event log related to the TARGET's application for benefits, there is a note indicating that FEMA called the TARGET on January 25, 2025, regarding the revocation of his eligibility for FEMA-funded lodging.  There is also a note indicating that the TARGET called FEMA on January 27, 2025, with a question about whether he could change hotels.

41.   Using open-source databases, I researched the IP addresses associated with the recorded activity on the TARGET's FEMA account.  These IP addresses resolve to T-Mobile, indicating that a mobile device, such as a smart phone,

subscribed to T-Mobile was used to access the TARGET's FEMA
account.

42.   Based on open-source databases, I am aware that, the
provider of the -2746 Number (the number the TARGET included in
his FEMA application) is T-Mobile.

43.   Based on my conversations with ESPD Detectives, I am
aware that the TARGET has called ESPD using the -2746 Number as
recently as March 4, 2025.   Thus, I believe that the TARGET is
still in possession of and is still using the phone he used to
communicate with FEMA in January 2025, as described above.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

44.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.   Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

17

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

      a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress the TARGET's thumb and/or fingers on
the device(s); and (2) hold the device(s) in front of the

TARGET's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

47.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

48.  For all the reasons described above, there is probable cause to believe that the TARGET has committed a violation of 18 U.S.C. § 1040 (Fraud in Connection with Major Disaster or Emergency Benefits) for filing a false and fraudulent application for FEMA benefits related to the California Wildfires.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the TARGET, as described in Attachment A.

_____/s/_____
Luis A. Pineda, Task Force
Officer
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 7th day of March
2025.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

<u>PERSON TO BE SEARCHED</u>

The person of JAIME ARTURO CARRILLO ("CARRILLO"), date of birth July 8, 1976.  CARRILLO's California Department of Motor Vehicle ("DMV") records lists him as standing 5 feet, 10 inches tall, weighing approximately 200 pounds, with black hair and brown eyes.  A California DMV photograph of CARRILLO appears below.

The search of CARRILLO shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within CARRILLO's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.



i

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 287 (False Claims), 1040 (Fraud in Connection with Major Disaster or Emergency Benefits), and 1343 (Wire Fraud) (the "Subject Offenses"), from January 1, 2025, to present namely:

a.   Records, information, documents, programs, applications, or materials relating to the January 2025 wildfires in Southern California ("California Wildfires");

b.   Records, information, documents, programs, applications, or materials relating to President Biden's January 8, 2025, Major Disaster Declaration for California, related to the California Wildfires;

c.   Records, information, documents, programs, applications, or materials relating to benefits provided by Federal Emergency Management Agency ("FEMA"), including, but not limited to, the application process for such benefits;

d.   Records, information, documents, programs, applications, or materials relating to any application for government benefits connected to or available as a result of the California Wildfires, including but not limited to applications to FEMA, and any supporting documents or materials provided in connection with any such application;

e.   Records, information, documents, programs, applications, or materials relating to hotel or other lodging

options that individuals and families affected by the California
Wildfires were able to access using benefits provided by FEMA;

     f.   Records, information, documents, programs,
applications, or materials relating to the condition of 413 W.
111th Street, Los Angeles, California 90061-1563 and its
surrounding area, including, but not limited to, information
relating to any impact on 413 W. 111th Street, Los Angeles,
California 90061-1563 and its surrounding area from the January
2025 wildfires in Southern California;

     g.   Records, information, documents, programs,
applications, or materials sufficient to show call log
information, including all telephone numbers dialed from any
digital device and all telephone numbers accessed through any
push-to-talk functions, as well as all received or missed
incoming calls;

     h.   Records, information, documents, programs,
applications, or materials related to text, email, or other text
or written communications, including communications sent through
or via instant and social media platforms and applications such
as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype,
Telegram, and WhatsApp, relating to the California Wildfires;

     i.   Records, information, documents, programs,
applications, or materials related to text, email, or other text
or written communications, including communications sent through
or via instant and social media platforms and applications such
as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype,
Telegram, and WhatsApp, relating to disaster benefits available

or provided to individuals, families, and/or entities affected by the California Wildfires, including but not limited to communications with FEMA representatives (including contractors), or anyone else concerning such benefits; and

       j.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

    2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

    3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

       b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       c.   evidence of the attachment of other devices;

       d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       e.   evidence of the times the device was used;

       f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

       g.   records of or information about Internet Protocol addresses used by the device.

4.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

       d.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

        g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

        7.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

        8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress JAIME ARTURO CARRILLO's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2)

viii

hold the device in front of JAIME ARTURO CARRILLO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.